**MR. FRANK, INC., Plaintiff,**

v.

**WASTE MANAGEMENT, INC.,
Defendant.**

No. 82 C 4346.

United States District Court,
N.D. Illinois, E.D.

May 23, 1984.

David R. Barr, James E. Beckley & Assoc., Chicago, Ill., for plaintiff.

Joseph V. Giffin, Gregory Wrobel, Chadwell & Kayser, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

DECKER, Senior District Judge.

### I. *Introduction*

This antitrust case is before the court on a number of motions. Plaintiff, Mr. Frank, Inc., (Mr. Frank) moves for sanctions under Fed.R.Civ.P. 37 and for other relief for the failure of defendant, Waste Management,

Inc. (WMI), to comply with discovery orders. WMI moves to dismiss the complaint, for summary judgment, to strike certain allegations, and for sanctions under Fed.R.Civ.P. 11.

## II. *Factual Background*

WMI hauls, treats, stores, and disposes of industrial waste and has a large share of the disposal market in northern Illinois. *See* Second Amended Complaint ¶ 22 at 7. Mr. Frank transports industrial wastes in that region and is thus both a customer and a competitor of WMI. Mr. Frank alleges, and WMI does not dispute, that for the purposes of this suit the relevant geographic market is those portions of Illinois, Indiana, Wisconsin, and Michigan within 150 miles of Cook County. *See id.* at ¶ 20 at 6.

WMI acquired control of Chem-Nuclear, Inc. (Chem-Nuclear) in July, 1982. Chem-Nuclear also transports, treats, and stores various types of waste. Chem-Nuclear has two subsidiaries, Chem Securities Systems, Inc. (CSSI) and Chem Resource Recovery of Indiana, Inc. (CRRI).

CSSI acquired an option to purchase a waste disposal facility in Grand Rapids, Michigan (the Grand Rapids facility) in 1980. In May, 1981, CSSI exercised its option but delayed closing on the sale. CSSI assumed control of the site under an "Operating Agreement" in July, 1981 from Cascade Resource Recovery, Inc. (Cascade). Also in July, CSSI loaned Cascade approximately $1.8 million for improvements at the Grand Rapids facility. WMI thereafter acquired Chem-Nuclear and, therefore, its subsidiary CSSI. CSSI then lent Cascade an additional $400,000. Cascade still owes CSSI all or a substantial portion of the loans.

CSSI informed Cascade in December, 1982 that it was canceling the option and operating agreements. Cascade's owners sued in Michigan state court to enforce those agreements and secured a temporary restraining order against the cancellation. CSSI and Cascade later reached a "handshake deal" for the return of the operation of the facility to Cascade. CSSI remains the registered operator of the site with the Michigan Department of Natural Resources (MDNR). The Grand Rapids facility closed in March, 1983. It apparently remains closed today.

In May, 1982, before WMI acquired them, CSSI and CRRI entered into similar option and operating agreements with Continental Waste Systems, Inc. (Continental) with respect to Continental's waste disposal facilities in Fort Wayne, Indiana (the Fort Wayne facilities). CRRI and CSSI terminated those agreements after WMI acquired their parent corporation, Chem-Nuclear. CSSI and CRRI now own only a right of first refusal with respect to any offer to purchase a 50% or greater interest in one of the Fort Wayne facilities (the Clinton Street facility).

Chem-Clear, Inc. (Chem-Clear) is a waste disposal and treatment company with facilities in Illinois, Ohio, Pennsylvania, and Maryland. A large percentage of Mr. Frank's business consists of transporting waste to Chem-Clear's Chicago site. WMI and Chem-Clear negotiated extensively over the possible acquisition by WMI of all or some of Chem-Clear's facilities. WMI's only present interest in Chem-Clear is that Chem-Clear owes WMI approximately $140,000.

## III. *Discussion*

### A. *Motion for Rule 37 Sanctions and Other Relief*

Mr. Frank moves for sanctions because WMI failed to provide six documents requested in connection with three depositions.[1] The depositions took place within a court-ordered time limit for discovery on

---

**1.** The court assumes that Mr. Frank complains only about these documents because it attached only these to its memorandum. The court's order with respect to the Rule 37 motion, however, applies to any documents produced by WMI too late for use in the Tinnan, Buntrock and Harrison depositions.

the motion to dismiss and for summary judgment.

The first document is a letter from Leonard Tinnan (Tinnan), WMI's Director of New Business Development, to Christy Bell (Bell), Chem-Clear's Chairman of the Board, dated January 4, 1983 and concerning the preliminary injunction motion which Mr. Frank filed in December, 1982 to prevent WMI from acquiring Chem-Clear. Attached to the letter is a copy of a letter from Joseph Giffin (Giffin), WMI's counsel, about the preliminary injunction motion and a copy of the motion itself. Exhibit B to Plaintiff's Motion for Rule 37 Sanctions. The second document is a memorandum from Jim Koenig (Koenig) of WMI to Milo Harrison (Harrison), the president of a WMI subsidiary, summarizing the pros and cons of acquiring Chem-Clear and recommending that WMI not proceed with the acquisition. Exhibit B to Plaintiff's Reply Memorandum in Support of Rule 37 Motion. The third is a December 9, 1982 analysis by Harrison of the proposed acquisition of Chem-Clear and includes a possible purchase price. Exhibit D to *id.* The fourth document is an undated, unsigned memorandum setting forth possible "approaches" to the acquisition of Chem-Clear, including the acquisition of an interest in Chem-Clear's Chicago facility. Exhibit F to *id.* The fifth is a more detailed analysis of "approach" # 4, the acquisition of only the Maryland and Pennsylvania Chem-Clear sites. Exhibit G to *id.* The sixth is Chem-Clear's internal 1983 forecast and is dated December 27, 1982. Exhibit H to *id.*

Mr. Frank noticed Tinnan's deposition on May 13, 1983 and attached a broad request for the production of documents pursuant to Fed.R.Civ.P. 34. Exhibit A to Plaintiff's Motion for Rule 37 Sanctions. Tinnan produced several documents but did not produce any of those listed above. On May 24, Mr. Frank noticed the depositions of Dean Buntrock (Buntrock), WMI's president and chairman of the board, and of

Harrison, and attached document requests identical to that which accompanied Tinnan's notice of depositions.[2] WMI objected to the Buntrock deposition but the court ordered on June 2, 1983 that it go ahead. The court allowed Mr. Frank's counsel to ask Buntrock about WMI's proposed acquisitions of Chem-Clear facilities outside the market relevant to this suit. The court did not, however, order the production of documents. Neither the parties nor the court discussed the production of documents at the June 2nd hearing.

The Buntrock and Harrison depositions proceeded on June 6, 1983 but neither produced any documents. Mr. Frank presented a motion to compel production of the requested documents on June 8, 1983. WMI objected to producing documents relating to the acquisition of the facilities outside the relevant market and filed an affidavit by Giffin in connection with that objection. The court ordered the documents to be produced and WMI has complied with that order. Mr. Frank filed its motion for sanctions because WMI did not produce the six documents listed above until after the June 8 hearing.

 Mr. Frank cannot secure sanctions under Fed.R.Civ.P. 37(b). That rule provides for sanctions for failure "to obey an order to provide or permit discovery ...." The only order this court entered with respect to the production of documents is the June 8 order with which WMI complied.

 Fed.R.Civ.P. 37(d) allows the court to impose sanctions absent disobedience of a court order. The court may do so if a party fails to make a written response to a proper Rule 34 request within 30 days. *Charter House Ins. Brokers v. New Hampshire Ins.,* 667 F.2d 600, 604 (7th Cir.1981). WMI produced the documents from Harrison's and Buntrock's files within thirty days of the request on May 24. WMI did not produce some of those from Tinnan's until sometime after June 13. WMI thus violated Rule 37(d) unless it made a "written response" with respect to

---

**2.** Mr. Frank filed Tinnan's notice of deposition on May 18, 1983 and Buntrock's and Harrison's on May 31, 1983. WMI admits their receipt on

the earlier dates. Defendant's Memorandum in Opposition to Rule 37 Relief at 2.

the Tinnan documents not produced before June 13.

WMI's only such written response before turning over the documents June 15–17 was Giffin's affidavit of June 6, 1983. Exhibit I to Plaintiff's Motion for Rule 37 Sanctions. That affidavit concerns only WMI's objections to the production of documents which relate to WMI's proposed acquisition of Chem-Clear's facilities in Pennsylvania and Maryland. *Id.* It does not address WMI's failure to produce documents which relate to the proposed acquisition of any interest in Chem-Clear's Chicago facilities. As to those documents, therefore, WMI made no "written response" to the request for the Tinnan documents until after June 13.

The court hesitates to punish WMI severely for the delay.[3] "It is well settled that a district judge should tailor the choice of sanction to the severity of the misconduct." *Charter House Ins. Brokers v. New Hampshire Ins.*, 667 F.2d at 605. The document request was a broad one and WMI was only a few days late. Furthermore, Mr. Frank would be no better off if WMI had complied with the rules and produced the documents on June 12. The documents still would not have been available for the depositions. Under these circumstances the court chooses to impose no sanctions.

Mr. Frank is nevertheless entitled to ask Tinnan, Buntrock, and Harrison about the documents that were produced after their depositions. The court grants Mr. Frank thirty days to do so. Those depositions are to be limited strictly to questions about the documents produced by WMI after the previous depositions. The court further directs the parties to file transcripts of these limited depositions with the clerk of the court within 45 days.

### B. *Motions to Dismiss and for Summary Judgment*

The court treats WMI's motions for summary judgment and to dismiss together as

a motion for summary judgment. *See* Fed. R.Civ.P. 12(b). WMI "has the burden of clearly establishing the non-existence of any genuine issue of fact that is material to a judgment in [its] favor." *Cedillo v. International Assn. of Bridge and Structural Iron Workers, Local Union No. 1,* 603 F.2d 7, 10 (7th Cir.1979). When the court enters summary judgment for a defendant it "is, in effect, concluding that based on the evidence upon which the plaintiff intends to rely at trial, no reasonable jury could return a verdict for the plaintiff." *Weit v. Continental Illinois Bank and Trust Co.,* 641 F.2d 457, 461 (7th Cir. 1981), *cert. denied,* 455 U.S. 988, 102 S.Ct. 1610, 71 L.Ed.2d 847, *reh. denied,* 456 U.S. 938, 102 S.Ct. 2001, 72 L.Ed.2d 461 (1982).

#### 1. *Count I*

Mr. Frank brings Count I under § 7 of the Clayton Act, 15 U.S.C. § 18. Count I seeks primarily divestiture of WMI's interests in the Grand Rapids, Fort Wayne, and Chem-Clear facilities, as well as divestiture of WMI's transportation operations. Second Amended Complaint ¶¶ 46–48. Count I also seeks treble damages. The court discusses Mr. Frank's entitlement to damages under the Clayton Act in its discussion of Count II.

Section 16 of the Clayton Act provides in relevant part:

> Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws, including [§ 7 of the Clayton Act], when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity....

15 U.S.C. § 26. The United States Court of Appeals for the Ninth Circuit has held that

---

3. Mr. Frank seeks sanctions not only under the Federal Rules of Civil Procedure but also under the court's "inherent" equity powers. Assuming

the court possesses such authority, the present circumstances do not warrant its invocation.

divestiture is not a form of "injunctive relief" within the meaning of § 16. *ITT Corp. v. GTE Corp.*, 518 F.2d 913, 920 (9th Cir.1975). The Seventh Circuit took note of the *ITT* decision but refused to decide the question in *Ohio-Sealy Mattress Manufacturing Co. v. Sealy, Inc.*, 669 F.2d 490, 496 (7th Cir.), *cert. denied* 459 U.S. 943, 103 S.Ct. 257, 74 L.Ed.2d 201 (1982). No private plaintiff has ever secured divestiture. *See* 3 Von Kalinowski, *Antitrust Laws and Trade Regulation*, § 15.02[1][b].

▮ The legislative history of § 16 establishes that Congress did not intend to make divestiture available to private plaintiffs. *See ITT Corp. v. GTE Corp.*, 518 F.2d at 920–924; *accord, NBO Industries Treadway Co., Inc. v. Brunswick Corp.*, 523 F.2d 262, 278 (3rd Cir.1975), *vacated on other grounds sub. nom. Brunswick Corp. v. Pueblo Bowl-O-Mat*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). Mr. Frank seeks to overcome this obstacle by arguing that divestiture is a necessary remedy in today's economy because "corporations, like WMI are so large that they can acquire smaller corporations with a phone call and a check drawn from general funds." Def.Mem. at 48 (footnote omitted). Since Congress could not have foreseen this contingency in 1914, Mr. Frank argues, this court should not allow Congressional intent to circumscribe the remedies available under the Clayton Act. The Third Circuit has noted, in passing, its agreement with this analysis. *NBO Industries v. Brunswick Corp.*, 523 F.2d at 278.

It is not this court's prerogative to update the Clayton Act. Congressional intent, as determined from the language of the statute and its legislative history, is the court's sole concern. *Cf. United States v. Agrillo-Ladlad*, 675 F.2d 905, 907–911 (7th Cir.), *cert. denied*, 459 U.S. 829, 103 S.Ct. 66, 74 L.Ed.2d 67 (1982) (discussing Congressional intent with respect to 18 U.S.C. § 844(j)); *see generally* 2A Sutherland, *Statutes and Statutory Construction* § 45.05, at 16 (4th ed. 1972).[4] While the word "injunctive relief" in § 16 of the Clayton Act may be ambiguous, the legislative history is not: injunctive relief excludes divestiture. *ITT Corp. v. GTE Corp.*, 518 F.2d at 920–924. Mr. Frank's policy arguments miss this crucial, fundamental point. The Court dismisses Count I's prayer for divestiture.

### 2. *Count II*

Counts I and II seek treble damages for, and Count II seeks a permanent injunction against, WMI's alleged pattern of acquisitions in violation of § 7 of the Clayton Act. Second Amended Complaint ¶ 48 at 19, ¶ 51 at 23. Mr. Frank alleges specifically that WMI has unlawfully acquired interests in Chem-Clear, the Grand Rapids and Fort Wayne facilities, and waste disposal sites in Wisconsin, Michigan, and Missouri.[5] WMI argues that Mr. Frank has no standing to challenge the alleged acquisitions and that it has acquired no "assets" in the Grand Rapids or Fort Wayne facilities or Chem-Clear. WMI also contends that Mr. Frank is not entitled to injunctive relief.

▮ Mr. Frank has standing to sue for damages under the antitrust laws. Mr. Frank is a consumer of disposal services and the facilities in question are within the relevant geographic market. *See* Second Amended Complaint ¶¶ 20–21 at 6, ¶ 29 at 9. Mr. Frank further alleges that it "will in the future, as it has in the past, be forced to pay monopoly prices for disposal and treatment...." *Id.* at ¶ 45 at 18. These facts alone give Mr. Frank standing to sue for damages from a diminution of competition in the waste disposal market. *Reiter v. Sonotone Corp.*, 442 U.S. 330, 99

---

**4.** *See also Osborn v. Bank of United States*, 22 U.S. 738, 866, 9 Wheat 738, 866, 6 L.Ed. 204 (1824) (Marshall, C.J.) ("Judicial power is never exercised for the purpose of giving effect to the will of the Judge; always for the purpose of giving effect to the will of the Legislature; or, in other words, to the will of the law.")

**5.** Neither party identifies or discusses the facilities in Wisconsin, Michigan, and Missouri. Their identity and WMI's interests in them, if any, is irrelevant to the court's decision today.

S.Ct. 2326, 60 L.Ed.2d 931 (1979).[6] WMI does not contend that Mr. Frank is an indirect purchaser of disposal services or that Mr. Frank's alleged injury is remote. Yet these are the only limitations on the treble damages remedy. *Blue Shield of Virginia v. McCready,* 457 U.S. 465, 473–478, 102 S.Ct. 2540, 2546–2548, 73 L.Ed.2d 149 (1982).

■ WMI also takes far too narrow a view of the reach of the Clayton Act. Section 7 "is primarily concerned with the end result of a transfer of a sufficient part of the bundle of legal rights and privileges from the transferring person to the acquiring person to give the transfer economic significance and the proscribed adverse economic 'effect'." *United States v. Columbia Pictures Corp.,* 189 F.Supp. 153, 182 (S.D.N.Y.1960). "[Assets] is not a word of art, nor is it given a built-in definition by statute .... As used in this statute, and depending upon the factual context, 'assets' may mean anything of value." *Id.* (footnote omitted); *see also United States v. ITT Continental Baking Co.,* 485 F.2d 16, 20 (10th Cir.1973), *rev'd on other grounds,* 420 U.S. 223, 95 S.Ct. 926, 43 L.Ed.2d 148 (1975) (holding that a "sales agreement" between a bakery company and a competing bakery was an indirect acquisition violative of an FTC order based on § 7 of the Clayton Act).

A broad, pragmatic view of the statutory language is consistent with the Congressional purpose that § 7 be "a prophylactic measure, intended 'primarily to arrest apprehended consequences of intercorporate relationships before those relationships could work their evil ....' " *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. at 485, 97 S.Ct. at 695 (quoting *United States v. E.I. Du Pont de Nemours and Co.,* 353 U.S. 586, 597, 77 S.Ct. 872, 879, 1 L.Ed.2d 1057 (1957)); *see also* H.R.Rep. No. 1191, 81st Cong. 1st Session at 8–9,

*reprinted in* 7 E. Kintner, *Federal Antitrust Laws and Related Statutes* (1980), at 3468 (reporting on 1950 amendments to the Clayton Act) (the Clayton Act "covers not only purchase of assets or stock but also *any other method of acquisition,* such as, for example, lease of assets. It forbids not only direct acquisitions but also indirect acquisitions ....") (emphasis added). The economic significance of the relationship, rather than its size or form, is the relevant inquiry.

■ Mr. Frank has made a sufficient showing with respect to WMI's acquisition of an interest in the Grand Rapids facility. WMI has treated the site as its own. In early 1983, WMI brought waste to Grand Rapids for which it incurred a "debt" of $30,802. Deposition of Louis Vanderstel (Vanderstel Dep.) II at 47. Yet someone at WMI told Vanderstel that "they were intercompany bills and [WMI] didn't pay intercompany bills." *Id.* Furthermore, Cascade apparently still owes CSSI $2.1 million and CSSI may have the right to take immediate possession of the site. Vanderstel Dep. I at 24, 83, 105. Cascade cannot hope to pay the debt unless it reopens but CSSI closed the facility in March, 1983. Vanderstel Dep. II at 61, 38. Mr. Frank may be able to prove that WMI's acquisition of interests in Grand Rapids violates § 7.

WMI's interest in Fort Wayne could also be economically significant. WMI retains a right of first refusal to purchase a 50% or greater interest in the Clinton Street facility. That facility is large enough to be a competitive force in the market. *Compare* Deposition of Thomas Hanchar (Hanchar Dep.) at 11 with Deposition of Greg Valocchi (Valocchi Dep.) at 8. Its profitability depends on expansion and both CSSI and Continental had plans to expand it. Deposition of Lee Archambeau (Archambeau Dep.) at 40–41; Hanchar Dep. at 16. The

---

**6.** Mr. Frank's standing to seek damages in Counts III, IV and V also arises from its status as a consumer of disposal services. All three counts incorporate the allegation that "[t]he ultimate effect [of WMI's interests in Chem-Clear, Grand Rapids and Fort Wayne] is higher prices

for disposal...." Second Amended Complaint ¶ 38 at 12. Mr. Frank has standing to assert its price-fixing claim because that count includes the allegation that WMI and Chem-Clear raised prices to Mr. Frank. *Id.,* ¶ 24 at 24.

expansion will require a considerable infusion of capital, Archambeau Dep. at 90–91, and the Hanchar family has been unable to raise it. Hanchar Dep. at 16. WMI's right of first refusal prevents WMI's competitors from buying the site and expanding it. That could be WMI's purpose in holding the right. Mr. Frank understandably has difficulty in presenting direct evidence of WMI's purpose, but WMI offers no evidence of a legitimate business purpose for the right of first refusal. In any event, "summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles...." *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962).[7]

Chem-Clear presents a closer but nevertheless similar situation. Chem-Clear's $140,000 debt to WMI may constitute an economically significant "asset" because Chem-Clear is in financial straits. *See* Deposition of Carl Cording (Cording Dep.) I at 12, 17, 21, 37–38. WMI's status as a substantial creditor could give it appreciable power over Chem-Clear's actions. Cording described the debt as "two fairly significant bills," *id.* at 26, and was sufficiently concerned about them that he "prevailed upon [WMI] to stay away from those bills for a while," *id.* at 27. WMI did not press for collection while it and Chem-Clear negotiated WMI's proposed takeover of Chem-Clear. Cording Dep. II at 22. Mr. Frank is entitled on this record to an opportunity to prove the economic significance of WMI's creditor interest in Chem-Clear.

Mr. Frank has also adequately supported the injunctive relief claims of Count II. Mr. Frank "need only demonstrate a significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur." *Zenith Corp. v. Hazeltine*, 395 U.S. 100, 130, 89 S.Ct. 1562, 1580, 23 L.Ed.2d 129 (1969) (citations omitted). If, for example, Mr. Frank is able to prove

that WMI's creditor's interest gives WMI significant control over Chem-Clear, then that interest would be a "contemporary violation" of the Clayton Act. *See* p. 867, *supra.* That violation would create a significant risk of harm to Mr. Frank because it takes a substantial portion of the waste it hauls to Chem-Clear facilities. *See* Cording Dep. II at 43. Similarly, if Mr. Frank can prove the economic significance of WMI's interests in the Fort Wayne and Grand Rapids facilities, those also would be contemporary violations of the Clayton Act. That WMI acquired and holds them is itself evidence that they are "likely to continue," and the harm to Mr. Frank is the danger of higher prices. Mr. Frank's claim for injunctive relief must stand.

### 3. *Count III*

Mr. Frank brings Count III under Section 1 of the Sherman Act, which prohibits combinations or conspiracies in restraint of trade. 15 U.S.C. § 1. Mr. Frank alleges that WMI conspired with Chem-Clear in early 1983 to raise prices for waste disposal. Second Amended Complaint at ¶¶ 31, 42 at 24. Mr. Frank also alleges that WMI conspired with its subsidiaries, CSSI and CRRI, to close the Grand Rapids and Fort Wayne facilities. *Id.* at ¶¶ 30, 32 and 23–24. Count III seeks treble damages and a permanent injunction. *Id.* at ¶ 54 at 26.

### a. *Chem-Clear*

Chem-Clear raised its prices in early 1983. *See* Valocchi Dep. at 28–31. At approximately the same time, WMI eliminated a "quantity discount" at its Chicago facility. Affidavit of Thomas Tomaszewski at 2. Mr. Frank alleges that WMI and Chem-Clear conspired to institute these "parallel" price increases.

An allegation of parallel pricing does not by itself state a claim under the Sherman Act. *Quality Auto Body, Inc. v.*

---

7. WMI argues that, under *Lupia v. Stella D'Oro Biscuit Co.*, 586 F.2d 1163 (7th Cir.1978), *cert. denied*, 440 U.S. 982, 99 S.Ct. 1791, 60 L.Ed.2d 242 (1979), the court must delve more deeply into issues of intent. The intent of the defendant in *Lupia*, however, was "not in issue." *Id.* at 1166.

*Allstate Ins. Co.,* 660 F.2d 1195, 1201 (7th Cir.1981), *cert. denied,* 455 U.S. 1020, 102 S.Ct. 1717, 72 L.Ed.2d 138 (1982). Parallel behavior and evidence of an opportunity to conspire, such as the negotiations between WMI and Chem-Clear, also does not suffice. *Weit v. Continental Illinois Bank and Trust Co.,* 641 F.2d at 462. Mr. Frank adds only evidence that WMI and Chem-Clear exchanged information with respect to the "price structure" of the Chicago market. Cording Dep. II at 23. "However, when the plaintiff ... relies on circumstantial evidence alone, the inference of unlawful agreement rather than individual business judgment must be the compelling, if not the exclusive, rational inference." *Weit v. Continental Illinois Bank and Trust Co.,* 641 F.2d at 463. Count III's price-fixing claim, at least on the present record, fails under this standard.

Chem-Clear's president denied any agreement about prices and termed the idea "absurd." Cording Dep. II at 65. Chem-Clear's Chicago manager also denied any agreement to fix prices. Valocchi Dep. at 39–40. Valocchi further explained that Chem-Clear raised prices in Chicago because it was not covering costs, and that even at the new higher prices it was losing money. *Id.* at 28–31. WMI's elimination of its quantity discount has a similarly justifiable business explanation. Apparently no one but Mr. Frank brought in enough waste to qualify for it and even Mr. Frank took advantage of it only twice. Def. Reply Mem. at 15–16; Deposition of Richard Grad (Grad Dep.) I at 52. The discount simply was serving little or no commercial purpose.

Mr. Frank has conducted almost eleven months of vigorous discovery. Yet the inference of an unlawful agreement between WMI and Chem-Clear is far from compelling. The court hesitates to enter summary judgment on this claim, however, because Mr. Frank is entitled to some additional limited discovery concerning WMI's dealings with Chem-Clear. *See* p. 864, *supra* (regarding documents produced after relevant depositions). The court cannot ignore the possibility, however slight, that the additional testimony will be sufficient to keep the price-fixing claim in the case. The court will reconsider summary judgment on the price-fixing claim upon the completion and filing of those depositions.

#### b. *CSSI and CRRI*

Mr. Frank alleges that WMI conspired with its own subsidiaries, CSSI and CRRI, to restrain trade by forcing the closure and/or bankruptcy of the Grand Rapids and Fort Wayne facilities. Second Amended Complaint ¶¶ 30, 32 at 23–24. A preliminary question is under what circumstances a parent corporation can "conspire" with its subsidiaries. The United States Supreme Court is currently reconsidering this issue. *Copperweld Corp. v. Independence Tube Corp.,* —— U.S. ——, 103 S.Ct. 3109, 77 L.Ed. 1365 (1983). Any ruling by this court would be premature.

WMI does not dispute that its agents participated in the subsidiaries' decisions with respect to the two facilities. The closure of the Grand Rapids site obviously restrains trade because one facility, possibly a competing one, is absent from the market. The effect of WMI's right of first refusal on the market is less clear but the record contains sufficient evidence for the court to infer that its purpose and effect may be to restrain commerce. *See* p. 866, *supra.* Assuming WMI can conspire with its subsidiaries, Mr. Frank is entitled to a chance to prove these facts.

#### 4. *Count IV*

Mr. Frank brings Count IV under § 2 of the Sherman Act, which prohibits monopolizing or attempting to monopolize any part of the trade or commerce "among the several States." 15 U.S.C. § 2. To prove its allegations, Mr. Frank must establish:

(1) a specific intent to monopolize, *i.e.* to gain the power to control prices or to exclude competition in a line of commerce, ... (2) predatory or anti-competitive acts engaged in to further the purpose to monopolize, and (3) a dangerous probability of success in the relevant

market which requires evidence that the defendant had sufficient market power to have been reasonably able to create a monopoly. *Lektro-Vend Corp. v. Vendo Corp.*, 660 F.2d 255, 270 (7th Cir.1981), *cert. denied*, 455 U.S. 921, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982) (citations and footnote omitted). Count IV seeks treble damages and a permanent injunction. Second Amended Complaint ¶ 50 at 28.

WMI does not deny that it has a dominant share of the relevant market. *See* Second Amended Complaint ¶ 22 at 7. Mr. Frank has produced sufficient evidence of anti-competitive acts, the acquisition of the assets of competing concerns, to foreclose summary judgment on that element of the § 2 claim. *See* pp. 865–867, *supra*. Mr. Frank has no direct evidence of WMI's specific intent to monopolize but that evidence, if it exists, is in WMI's hands. Furthermore, summary procedures on issues of intent and motive should be used "sparingly" in antitrust cases. *Poller v. Columbia Broadcasting Systems*, 368 U.S. at 473, 82 S.Ct. at 491. Count IV accordingly survives.

### 5. Count V

Mr. Frank brings Count V under the Illinois Antitrust Act, Ill.Rev.Stat. ch. 38, 60–3 *et seq.* Count V restates the monopolization allegations of Count IV and seeks treble damages and a permanent injunction. Second Amended Complaint ¶¶ 10–28 at 28; ¶ 50 at 29. Mr. Frank invokes this court's pendent jurisdiction under *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

The Illinois Antitrust Act makes it unlawful to "[e]stablish, maintain, use, or attempt to acquire monopoly power over any substantial part of the trade or commerce of this State for the purpose of excluding competition or of controlling, fixing, or maintaining prices in such trade or commerce...." Ill.Rev.Stat. ch. 38, § 60–3(3). This language closely tracks § 2 of the Sherman Act, no doubt because "the Illi-

nois Antitrust Act ... was patterned after the Sherman Act...." *People ex rel. Scott v. Schwulst Building Center, Inc.*, 89 Ill.2d 365, 369, 59 Ill.Dec. 911, 432 N.E.2d 855 (1982). The Illinois Act also provides that "[w]hen the language of this Act is the same or similar to the language of a Federal Anti-trust Law, the courts of this State in construing this Act shall follow the construction given to the Federal Law by the Federal Courts." Ill.Rev.Stat. ch. 38, § 60–11. Count V accordingly must survive for the same reasons Count IV survives.

WMI urges the court to dismiss Count V because the actions which Mr. Frank alleges do not affect Illinois commerce substantially. *See People ex rel. Scott v. Convenient Food Mart, Inc.*, 21 Ill.App.3d 97, 315 N.E.2d 124 (1st Dist. 1974). Mr. Frank alleges, however, that those actions result in higher prices for disposal and treatment. *See* p. 868, *supra*. The relevant geographic market includes much of Illinois. Second Amended Complaint ¶ 20 at 6. Price increases in a market which encompasses part of Illinois are a sufficiently substantial effect on Illinois commerce for Mr. Frank to seek relief under the Illinois Antitrust Act.

### C. Motion to Strike

WMI moves under Fed.R.Civ.P. 12(f) to strike several sets of allegations from the Second Amended Complaint as irrelevant, impertinent, or scandalous. The court grants the motion in part.

The first set of allegations is paragraphs 34–37 of Count I, which detail ways in which WMI allegedly interfered with the orderly transaction of business at the Fort Wayne and Grand Rapids facilities. Those actions are highly relevant to Mr. Frank's claims concerning WMI's control of those facilities and the court finds nothing impertinent or scandalous about them.

WMI also complains about paragraphs 43 and 44 of Count I, which the other counts incorporate by reference. Those allegations purport to relate to Mr.

Frank's injuries but in fact merely list anti-competitive practices in which WMI has allegedly engaged. None of these practices relate to the alleged acquisitions and conspiracies which underlie Counts I–III. The court accordingly orders them stricken from those counts. The allegations of ¶¶ 43 and 44 do pertain to and may remain in the monopolization claims of Counts IV and V because they concern "predatory or anti-competitive acts" allegedly "engaged in to further the purpose to monopolize." *Lektro-Vend Corp. v. Vendo Corp.*, 660 F.2d at 270.

▬▬ The last set of allegations consists of paragraphs 46–48 of Count II, which seeks injunctive relief against future WMI acquisitions in the relevant market. WMI argues first that the allegations are irrelevant because Mr. Frank can secure no relief for "potential" violations of the Clayton Act. WMI's acquisitive pattern is relevant, however, to whether any present violation is likely to continue or recur, which is one element Mr. Frank must establish to get injunctive relief. *See* p. 867, *supra*.

▬▬ WMI's other complaint is that the allegations are too vague. The appropriate vehicle for clarifying vague allegations is not a motion to strike under Rule 12(f) but rather a motion for a more definite statement under Rule 12(e). Upon disposition today of WMI's motion to dismiss and for summary judgment, WMI will have its first occasion to answer the Second Amended Complaint. If in framing that response WMI finds that it requires a more definite statement, a 12(e) motion will be appropriate at that time.

### D. *Motion under Rule 11*

Lastly, WMI moves for sanctions under Fed.R.Civ.P. 11, which at the time Mr. Frank filed the Second Amended Complaint provided in relevant part: [8]

> The signature of an attorney [to a pleading] constitutes a certificate by him that he has read the pleading; that to the best of his knowledge, information and belief there is good ground to support it; and that it is not interposed for delay.

WMI argues that Mr. Frank's attorneys violated Rule 11 when they signed the Second Amended Complaint because they did not have a good faith basis to believe that three sets of allegations were true: that WMI had acquired an interest in Chem-Clear, that WMI had acquired interests in Grand Rapids and Fort Wayne, and that WMI and Chem-Clear had conspired to raise prices.

Courts rarely have imposed sanctions under old Rule 11. *See* 5 Wright and Miller, *Federal Practice and Procedure* § 1333. Indeed, the stricter language of the new Rule 11 "is intended to reduce the reluctance of courts to impose sanctions...." Advisory Committee Notes to Fed.R.Civ.P. 11. The standard under the older rule is "good-faith." *Id.; see also Nemeroff v. Abelson*, 620 F.2d 339, 350 (2nd Cir.1980). The court's inquiry here is thus whether Mr. Frank's attorneys, James Beckley (Beckley) and David Barr (Barr), had a good faith basis for their allegations. "The question is whether a reasonable attorney could have concluded that facts supporting the claim *might be established*, not whether such facts actually *had been established*." *Nemeroff v. Abelson*, 620 F.2d at 348.

▬▬ When they signed the Second Amended Complaint, Beckley and Barr had information that WMI had offered to purchase an interest in Chem-Clear. Deposition of David Barr (Barr Deposition) at 9. WMI in fact had made an offer, albeit one for Chem-Clear's facilities in Maryland and

---

**8.** Rule 11 now provides in relevant part:
The signature of an attorney or party constitutes a certificate by him that he has read the pleading, motion, or other paper; that to the best of his knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.

Pennsylvania. *See* Tinnan Dep.Ex. 3. Barr's source failed to indicate that the WMI offer was so limited. Barr Dep. at 9. Knowledge that WMI had offered to purchase part of Chem-Clear is a sufficient basis to allege in good faith that WMI had in fact purchased Chem-Clear.

WMI argues that Beckley and Barr were under a duty to inquire of Chem-Clear's president, Cording, whether WMI had acquired his company. Cording may not have been a reliable source of that information for Mr. Frank. Deposition of James Beckley (Beckley Deposition) at 4. Even if he were, old Rule 11, unlike the new one, does not require "reasonable inquiry" before filing a pleading. It requires only a good faith basis, and Beckley's and Barr's knowledge of WMI's offer suffices.

■ Beckley and Barr also had a sufficient basis for their allegations that WMI and Chem-Clear fixed prices. Because they knew that WMI had made an offer to purchase part of Chem-Clear, they knew that the parties were negotiating. Barr and Beckley also knew of WMI's and Chem-Clear's "parallel" price increases during this same period. *See* Second Amended Complaint at ¶ 42 at 24. Knowledge of parallel behavior and of contemporaneous negotiations provides a good faith basis for price-fixing allegations. *Kinee v. Abraham Lincoln Federal Savings and Loan Assn.*, 365 F.Supp. 975, 982 (E.D.Pa.1973).

■ Finally, Beckley and Barr had a good faith basis to allege that WMI had acquired interests in the Grand Rapids and Fort Wayne facilities. Barr took Vanderstel's deposition on January 24, 1982 and elicited testimony about Cascade's substantial debt to WMI's subsidiary, CSSI. Vanderstel Dep. I at 22. Barr took Archambeau's deposition the next day and secured information about WMI's right of first refusal over the Clinton Street facility. *E.g.,* Archambeau Dep. at 32–33. These facts alone provide a good faith basis for Mr. Frank's allegations that WMI's interests in Fort Wayne and Grand Rapids violate the Clayton Act, *see* pp. 866–867, *supra.*

The court denies WMI's motions for Rule 11 sanctions. The court reminds the parties and counsel, however, that the higher standards of new Rule 11 apply to future filings in this case. The court will not hesitate to assess sanctions against those who violate its more stringent requirements.

IV. *Conclusion*

For the reasons stated above, the court grants defendant's motion to dismiss plaintiff's prayer for divestiture in Count I of the Second Amended Complaint, continues defendant's motion for summary judgment on the price-fixing allegations of Count III, and denies defendant's motions for dismissal and summary judgment in all other respects. The court denies defendant's motion for Rule 11 sanctions. The court grants defendant's motion to strike paragraphs 43–44 of Counts I and II and paragraphs 47 and 48 of Count III of the Second Amended Complaint but denies the motion to strike in all other respects. The court grants plaintiff leave to continue the depositions of Leonard Tinnan, Milo Harrison, and Dean Buntrock within thirty days of the entry of this order. These depositions are to be limited in scope to questions relating to any documents produced by defendant after May 23, 1983. The court denies plaintiff's motion for sanctions.